Filed 10/8/21

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| MARGARET McCANN, <br><br>     Plaintiff and Appellant, <br><br>     v. <br><br> CITY OF SAN DIEGO et. al., <br><br>     Defendants and Respondents. | D077568 <br><br><br><br> (Super. Ct. No. 37-2019-00011813-CU-TT-CTL) |


APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge. Affirmed in part and reversed in part.

Law Office of Todd T. Cardiff and Todd T. Cardiff for Plaintiff and Appellant.

Mara W. Elliot, City Attorney, George Schaefer, Assistant City Attorney, and Jana Mickova Will, Deputy City Attorney, for Defendants and Respondents.

# INTRODUCTION

Plaintiff Margaret McCann appeals a judgment in favor of defendant City of San Diego (City) on McCann's petition for writ of mandate and an order denying her request for a preliminary injunction. McCann challenges the City's environmental review process related to its decision to approve two sets of projects which would convert overhead utility wires to an underground system in several neighborhoods. McCann's primary concern is the need for the underground system to be supplemented with several above-ground transformers, which would be housed in three-foot-tall metal boxes in the public right-of-way.

According to McCann, the City violated the California Environmental Quality Act (CEQA), (Pub. Resources Code, § 21000 et seq.)[1] by failing to properly consider the environmental impact of these projects. The City determined one set of projects was exempt from CEQA, and adopted a mitigated negative declaration (MND) for the second set of projects. McCann asserts that the significant impact on the environment caused by the above-ground transformer boxes, and the projects as a whole, required the City to prepare an environmental impact report (EIR) for both sets of projects.

We conclude McCann's claims are barred as to the first set of projects because she failed to exhaust her administrative remedies to challenge the

---

[1]    Further statutory references are to the Public Resources Code unless otherwise stated. The administrative guidelines adopted by the Secretary of the California Natural Resources Agency to implement CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.) will be referred to as "Guidelines" followed by the section number. "[T]he Guidelines are entitled to great weight so long as they are not clearly unauthorized or erroneous." (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 240, fn. 3.) McCann does not challenge any of the Guidelines in this appeal.

City's determination that the projects were exempt from CEQA. To further the goal that environmental issues be resolved in an expeditious manner, the San Diego Municipal Code (Municipal Code) creates a specific procedure for interested parties to file an administrative appeal of an exemption determination before a project is submitted for approval. McCann did not avail herself of that procedure and she may not now raise that issue for the first time in this legal action. Her challenge to the trial court's order denying a preliminary injunction related to those projects necessarily fails.

Regarding the MND adopted for the other set of projects, McCann contends the City violated CEQA by segmenting the citywide undergrounding project into smaller projects; not defining the location of each transformer box before considering the environmental impact of the plan; and failing to consider the significant impact on aesthetics caused by the projects. We reject these assertions and conclude the City complied with CEQA.

However, we find merit in McCann's argument the City's finding that the projects would not have a significant environmental impact due to greenhouse gas emissions is not supported by substantial evidence. As we shall explain, although CEQA provides agencies with a mechanism to conduct a streamlined review of a project's greenhouse gas emissions by analyzing a project's consistency with a broader greenhouse gas emission plan, such as the City's "Climate Action Plan," the record shows the City never completed the required analytical process. Thus, remand is necessary to allow the City to conduct a further review to determine if the greenhouse gas emissions are consistent with the City's Climate Action Plan. We therefore reverse the judgment in part, but otherwise affirm.

3

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Utility Undergrounding Overview

In 1970, the City began its decades-long effort to convert its overhead utility systems, suspended on wooden poles, to an underground system. The local effort mirrored a shift across the state arising from the California Public Utilities Commission's decisions to require (1) new construction to install utility lines underground, and (2) utilities to allocate funds to convert existing overhead utility lines to underground. Constrained by the limits of this funding, the City established a separate "Surcharge Fund" in 2002 to provide for increased utility undergrounding.[2]

By the end of fiscal year 2016, the City had completed 406 miles of utility undergrounding, but still had to convert approximately 1,000 miles of overhead lines. As part of its new Utilities Undergrounding Program Master Plan (Master Plan), adopted in 2017, the City set a goal of undergrounding 15 miles of overhead lines each year.

Given the small scope of projects that could be completed in any one year due to the limited funding, the Master Plan and accompanying Municipal Code section developed a process to manage the selection and prioritization of undergrounding projects in any given year. The Master Plan divided the portions of the City with existing overhead utility lines into discrete "blocks" for "surcharge projects" and corridors for "20A projects" and

---

[2] Projects funded by the utility tariffs are known as "20A projects" and are focused on high-traffic corridors and tourism areas, whereas the other projects, often covering residential neighborhoods, are funded by the City's own program and sometimes referred to as "surcharge" projects. The projects at issue here include both 20A projects and surcharge projects.

provided a rough estimate of the cost to complete the undergrounding projects in each block.[3]

Following the process set forth in the Master Plan and Municipal Code, the City Council each year approves a "project allocation" to select blocks to be completed based on the available funding. Once the allocation is approved, City staff begins its initial work, including environmental review pursuant to CEQA, for each block.

Subsequently, the City Council creates an "Underground Utility District" including the selected blocks for projects to be completed with that year's funding. All residents and property owners within the proposed district are mailed a notice of public hearing and a map of the proposed area for the undergrounding projects. Any member of the public may attend and comment on the proposal. The City Council then holds a public hearing and, assuming no insurmountable issues arise, approves the creation of the Underground Utility District.

Thereafter, the City begins a detailed design process that takes one to two years to complete. During community meetings, residents and property owners are given an opportunity to discuss the projects, including the placement of utility boxes and streetlights. Throughout the design process, community members are notified of upcoming construction and invited to attend a community forum as the design is finalized.

During the construction phase, workers dig trenches or drill tunnels within the public right-of-way (i.e., streets and alleys) to accommodate the

---

[3] For purposes of the undergrounding program, each "block" is not the same as what is commonly referred to as a city block, but rather encompasses a group of streets, each varying in size but including dozens of homes within each neighborhood.

underground wires and cables. Lateral lines to individual buildings are completed via boring or trenching to the location of the current electrical meter. Workers then install underground conduit, fill in the soil, and then pull cable through the conduit.

At the same time, new transformers, cable boxes, and pedestals are installed above ground as needed. These transformers, the central focus of the claims raised in this case, are required for every 8 to 14 homes. The cube-shaped boxes are roughly three feet in each dimension, painted green, and placed on a short concrete pad measuring four feet by four feet.[4]

When construction is complete, the new system is energized and properties are switched to the new system. Thereafter, the existing overhead wires and utility poles are removed. As part of the utility undergrounding projects, the City also commits to install new streetlights, install curb ramps for sidewalks at intersections, repave streets after trenching, and plant trees.

This appeal involves McCann's challenge to the approval of two sets of undergrounding projects. Given the different circumstances arising from their different locations, one set was found to be exempt from CEQA and the

---

[4] In the trial court, the City requested judicial notice of a "Project Management Fact Sheet" that discusses the size of the transformers and the likely quantities. McCann opposed the request on the basis that the fact sheet was not in the administrative record and the trial court denied the request for judicial notice. However, that same document is included in the administrative record, as tab 544, and McCann did not file any objection to the inclusion of the document in the administrative record pursuant to rule 3.225(c) of the California Rules of Court. Having failed to do so, she waived any objection to the inclusion of the document in the administrative record.

other set required the preparation of an MND.  For sake of simplicity, we refer to these two groups as the "Exempt Projects" and the "MND Projects."[5]

## B.    Exempt Projects

In 2016 the City Council approved a project allocation identifying 11 blocks for undergrounding districts.  That same year, McCann began her involvement in the undergrounding process for her neighborhood.  In a series of e-mails to City staff, McCann discussed her concerns regarding the procedures relating to the inclusion of her neighborhood in the undergrounding plans.

On July 10, 2018, City staff made an environmental determination the 11 blocks were exempt from CEQA.  On the same day, the City issued a "Notice of Right to Appeal Environmental Determination" (Notice of Right to Appeal) identifying these 11 blocks.  The Notice of Right to Appeal included a description revealing that the projects would involve the construction of an "Underground Utility System," which would consist of trenching, "installing conduit and substructures such as transformers on concrete pads," installing cable through the conduits, providing individual customer connections, removing overhead utility lines and poles, and installing new streetlights. The description also discussed the potential need to install new utility poles at the boundaries of each district and it noted the projects included

---

[5]    The City refers to each undergrounding district as its own "project," such that multiple projects are included in each environmental review and city approval.  The parties do not dispute that the undergrounding projects are a "project" as that term is used under CEQA or assert the environmental review improperly grouped the city projects into one CEQA "project."  For ease of reference, we follow the City in referring to the subject of this litigation as "projects" rather than using the CEQA term of art to refer to the collected projects as a singular "project."

installation of curb ramps, sidewalk repairs, and street resurfacing. The description stated that "[a]ny street tree removal, relocation, and/or trimming would be done under the supervision of the City Arborist."

The Notice of Right to Appeal stated that the City had determined the projects were categorically exempt from CEQA pursuant to section 15302, subdivision (d) of the Guidelines. The City maintains this exemption "allows for the replacement or reconstruction of existing structures and facilities, including the conversion of overhead electric utility distribution system facilities to underground when the surface is restored to the existing condition, and where the new structure will be located on the same site and have substantially the same purpose and capacity."

The Notice of Right to Appeal further stated that this environmental determination "is appealable to the City Council" and that "[a]pplications to appeal CEQA determination to the City Council must be filed in the office of the City Clerk within 10 business days from the date of the posting of this Notice [of Right to Appeal]." The Notice of Right to Appeal was posted in the City Development Services Department Office, posted on the City's website, and was sent via e-mail to every city councilmember and to local community planning groups in the areas designated as exempt from CEQA. As McCann concedes, no one filed an administrative appeal.

On December 11, 2018, following a presentation at a public City Council meeting, the City Council approved setting a hearing for January 29, 2019 to consider the creation of the Underground Utility Districts for the 11 Exempt Projects. Days later, the City mailed a "Notice of City Council Public Hearing to Establish an Underground Utility District" to every affected property owner. The notice informed property owners that if the City Council established the districts, the utility company "will be obligated to remove all

8

overhead utility services from the streets and/or alleys and replace them with underground services." The notice further explained that the creation of the districts "would require the removal of overhead electric and communication wires and old wooden poles. Other street improvements associated with the conversion of utilities may include installation of new streetlights, installation of pedestrian curb ramps, street pavement renewal, and planting of street trees." The notice included a "Fact Sheet" with more information, and directed property owners to the City's website for details of the undergrounding program. The notice also informed the recipients of the date, time, and location of the hearing, and that they "may appear at this hearing in support or opposition."

Three days before the City Council hearing, McCann sent an e-mail to the City Council raising several issues regarding the Exempt Projects and asserting the environmental review was inadequate. In another e-mail, McCann noted she had been following the project on the City's website and by reviewing her local planning group's agendas, but had not seen the Notice of Right to Appeal. In another e-mail sent the day before the hearing, McCann asserted that the Notice of Exemption could not be filed until after the project was approved.[6]

In a report prepared for the hearing, staff explained that the City Council's adoption of the resolution creating the districts "allows staff to proceed with undergrounding of overhead utilities in coordination with utility companies." In compliance with the City's duty to consider the environmental impacts of every project, the report also explained that no EIR

---

[6] McCann appears to conflate the City's Notice of Right to Appeal with a separate CEQA document, a Notice of Exemption. As we will discuss, these are two distinct documents that serve different purposes.

9

was required because the projects were exempt from CEQA, "for which a Notice of Right to Appeal (NORA) has already been completed, and no appeals were filed."

At the hearing, City staff informed the City Council that if the districts were approved, staff "will move into the design phase as formally created districts." McCann's counsel spoke in opposition, claiming that the CEQA review was "premature" given there were no precise plans regarding tree removal and the placement of the transformer boxes. Several other residents attended and spoke in favor of the creation of the districts. As McCann notes, some of the speakers in favor expressed concerned about the placement of the transformer boxes and asked if they could be placed in alleys. When questioned by a councilmember, staff explained that the location of the transformers would be determined during the subsequent design phase. The City Council voted unanimously to approve the creation of the undergrounding districts for the Exempt Projects.

In February, the City issued two "notices of exemption" for the Exempt Projects.[7] As required under CEQA, the notices were filed in the office of the county clerk.[8]

---

[7] The City filed a separate notice of exemption for the project in Kensington, McCann's neighborhood, apparently in the expectation she may only challenge that project.

[8] As McCann notes, the notices of exemption were prepared and signed by City staff in July 2018, but not filed with the county clerk until after the projects were approved by the City Council. As we discuss *post*, this procedure complied with CEQA.

10

## C. MND Projects

In November 2018, the City published a draft MND for an additional nine potential undergrounding districts. Based on earlier discussions with Native American tribes, the City learned that some of the districts included sites with cultural significance. Following further inquiry, the City determined the projects may have a significant impact on cultural resources, but the impact could be mitigated by requiring monitoring by a tribe during trenching. The draft MND included a mitigation, monitoring, and reporting program aimed at mitigating any impact to archaeological and cultural resources that may be uncovered during trenching. Based on the monitoring process, the final MND determined that "although the proposed project could have a significant effect on the environment, there will not be a significant effect in this case because revisions in the project have been made by or agreed to by the project proponent." As part of this process, the City also considered the aesthetic effect and greenhouse gas emissions of the projects, but found they would have no significant impact.

At the same hearing at which the Exempt Projects were approved, the City Council approved setting a public hearing on March 5, 2019 to consider approving the MND Projects.[9] McCann and her attorney submitted written comments challenging the adequacy of the MND concerning the location of the transformers, the cumulative impact from greenhouse gases, and the effect on trees.

---

[9] Although the MND discusses nine districts, only eight districts were included in the hearing for approval. The missing project, for the district referred to as "UU957 Residential Block 70 (College Area)" was not included in McCann's writ petition and is not at issue in this case despite her reference to nine districts in the MND Projects.

At the hearing on March 5, 2019, McCann's attorney made a public comment in opposition to the projects to express his concerns with the MND. The City Council unanimously approved the creation of the undergrounding districts and adopted the MND and the associated mitigation, monitoring, and reporting program. Thereafter, the City filed a notice of determination providing notice of the adoption of the MND.

## D.  McCann's Petition for Writ of Mandate and Request for Preliminary Injunction

McCann filed a timely petition for writ of mandate, alleging the City violated CEQA when it determined the Exempt Projects were exempt. Shortly thereafter, she filed an amended petition to add an additional cause of action to allege the City similarly violated CEQA when it adopted the MND for the MND Projects.

Months later, in January 2020, McCann filed an ex parte application for a temporary restraining order and to set a hearing on an order to show cause regarding a preliminary injunction. In an accompanying declaration, McCann explained that the City cut down a "historic" pepper tree on her street. She also claimed to have spoken with a worker who informed her that the tree in front of her house was also to be cut down. She sought a temporary restraining order "enjoining [City] from engaging in any physical construction in furtherance of the undergrounding projects, including demolition or removal of trees, in project areas during the pendency of this action." The next day, the court issued a temporary restraining order enjoining the City from "cutting down any Pepper Trees in Kensington" and setting a hearing on the request for a preliminary injunction on the same day it was set to hear McCann's writ petition.

In an opposition, the City explained the tree removal was entirely unrelated to the undergrounding projects, but rather was part of a sidewalk

12

repair project. In a declaration, the City Forester explained that removal of the trees was necessary to repair the sidewalk and because some of the trees were suffering from excessive rot, which posed a public safety hazard by causing branches to fall.

After briefing and argument, the trial court denied both the writ petition and the request for a preliminary injunction. Regarding the preliminary injunction, the court found it had no jurisdiction to consider the request because the evidence established that the trees in question were not at risk of removal due to the undergrounding projects, but rather because of a different project that McCann did not challenge in her writ petition. The court also found that McCann did not establish a probability of success on her claims and the balancing of interests favored the City, which had a strong interest in removing trees that posed a risk to public safety.

Turning to the merits of McCann's writ petition, the trial court found that McCann failed to exhaust her administrative remedies prior to seeking judicial review of the Exempt Projects. The court noted the City provided an administrative appeal to challenge a determination a project was exempt from CEQA but McCann did not pursue this remedy and thus, she "may not challenge the City's approval of the categorical exemption determination." In the alternative, the court also rejected McCann's claims that the City (1) violated CEQA by not disclosing the exact location of the transformers; (2) did not provide adequate notice; and (3) improperly determined that a categorical exemption applies.

Regarding the MND Projects, the court found that McCann failed to demonstrate that substantial evidence supported a fair argument that the

13

MND Projects may have a significant impact on the environment.[10] Thus, it concluded that no EIR was required.

The court concluded that McCann "is not entitled to any relief" and denied the writ petition in full. The court directed the City's counsel to prepare a judgment. The court subsequently entered judgment and McCann timely appealed.[11]

## II. DISCUSSION

### A. Overview of CEQA

"CEQA was enacted to advance four related purposes: to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the

---

[10] The court's minute order does not address McCann's alternative argument that the City's finding that the projects would have no significant impact was not supported by substantial evidence. As we will discuss, although McCann's briefing on this issue is not entirely clear, she argues both that the City's finding is "clearly deficient" *and* that an EIR was necessary because there is a fair argument that the projects will have a significant impact.

[11] During the pendency of this appeal, we asked the parties to address the issue of the timeliness of McCann's appeal. At the time, the application of certain emergency orders declaring dates to be holidays for the purposes of computing time, entered by the superior court as a result of the COVID-19 pandemic, was uncertain. McCann provided additional briefing explaining why her appeal was timely, which the City does not dispute. We agree with McCann that her appeal was timely filed. We grant her request for judicial notice of the superior court's emergency orders as well as her additional unopposed request for judicial notice of additional documents related to the merits of her claim.

14

public the rationale for governmental approval of a project that may significantly impact the environment." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382 (*Building Industry*).)

To advance these purposes, CEQA requires an agency, such as the City, to "follow a three-step process when planning an activity that could fall within its scope." (*Building Industry*, *supra*, 62 Cal.4th at p. 382.) "First, the public agency must determine whether a proposed activity is a '[p]roject,' i.e., an activity that is undertaken, supported, or approved by a public agency and that 'may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment.' " (*Ibid*.)

Second, if the activity is determined to be a project, "the agency must next decide whether the project is exempt from the CEQA review process under either a statutory exemption (see § 21080) or [as in this case] a categorical exemption set forth in the CEQA Guidelines (see § 21084, subd. (a); Guidelines, § 15300 et seq.)." (*Building Industry*, *supra*, 62 Cal.4th at p. 382.) "A categorical exemption is based on a finding by the Resources Agency that a class or category of projects does not have a significant effect on the environment. ([ ] §§ 21083, 21084; Guidelines, § 15354.) Thus an agency's finding that a particular proposed project comes within one of the exempt classes necessarily includes an implied finding that the project has no significant effect on the environment." (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 115.) If an exemption applies, the project is excused from CEQA's environmental review, which occurs only if an agency determines the project is *not* exempt from CEQA. (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1186 ["Environmental review is required under CEQA only if a public agency

concludes that a proposed activity is a project and does not qualify for an exemption."].)

"If the agency determines the project is not exempt, it must then decide whether the project may have a significant environmental effect. And where the project will not have such an effect, the agency 'must "adopt a negative declaration to that effect." ' " (*Building Industry*, *supra*, 62 Cal.4th at p. 382.) A negative declaration is "a written statement briefly describing the reasons that a proposed project will not have a significant effect on the environment and does not require the preparation of an environmental impact report." (§ 21064.)

Relatedly, "[i]f potentially significant environmental effects are discovered, but the project applicant agrees to changes that would avoid or mitigate them, the agency prepares a mitigated negative declaration (§ 21080, subd. (c)(2); [ ] Guidelines, § 15070, subd. (b)), which also ends CEQA review." (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 489 (*Protecting Our Water*).) An MND is "a negative declaration prepared for a project when the initial study has identified potentially significant effects on the environment, but (1) revisions in the project plans or proposals made by, or agreed to by, the applicant before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment." (§ 21064.5.)

Third, if the agency's initial study of a proposed project produces substantial evidence supporting a fair argument that a project *may* have a

16

significant effect on the environment, it must prepare an EIR before approving the project. (*Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161, 187 (*Clews*).) "Determining environmental significance 'calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data.' (Guidelines, § 15064, subd. (b).) The Guidelines encourage public agencies to develop and publish 'thresholds of significance' (Guidelines, § 15064.7, subd. (a)), which generally promote predictability and efficiency when the agencies determine whether to prepare an EIR." (*Building Industry*, *supra*, 62 Cal.4th at p. 383.)

"In general, judicial review of agency actions for CEQA compliance extends to 'whether there was a prejudicial abuse of discretion.' (§ 21168.5; see *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 381 (*Muzzy Ranch*).) 'Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' (§ 21168.5.)" (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 495.) Our review as an appellate court is the same as the trial court's review: we focus on the agency's actions, not the trial court's decision, applying our independent, de novo review. (*Ibid*.) We discuss the more specific standards of review that apply to McCann's arguments concurrently with our discussion of those arguments.

## B.    The Exempt Projects

McCann maintains the City's determination that 11 of the underground districts were exempt from CEQA was erroneous and that the trial court erred in concluding she failed to exhaust her administrative remedies. Applying a de novo standard of review (*Citizens for Open Government v. City*

*of Lodi* (2006) 144 Cal.App.4th 865, 873 (*Citizens for Open Government*)), we find the exhaustion of administrative remedies doctrine applies and therefore need not consider her arguments challenging the City's finding the projects are exempt from CEQA.

### 1. McCann Did Not Exhaust Her Administrative Remedies for the Exempt Projects

"The exhaustion of administrative remedies doctrine 'bars the pursuit of a judicial remedy by a person to whom administrative action was available for the purpose of enforcing the right he seeks to assert in court, but who has failed to commence such action and is attempting to obtain judicial redress where no administrative proceeding has occurred at all; it also operates as a defense to litigation commenced by persons who have been aggrieved by action taken in an administrative proceeding which has in fact occurred but who have failed to "exhaust" the remedy available to them in the course of the proceeding itself.' [Citation.] As our Supreme Court has stated it: 'In brief, the rule is that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act.' [Citation.] The rule is a jurisdictional prerequisite in the sense that it 'is not a matter of judicial discretion, but is a fundamental rule of procedure laid down by courts of last resort, followed under the doctrine of *stare decisis*, and binding upon all courts.' " (*Citizens for Open Government, supra*, 144 Cal.App.4th at p. 874.)

Section 21177 addresses the exhaustion of administrative remedies in CEQA cases, but it does not prescribe a specific appeal process following a

18

determination a project is exempt from CEQA.[12]  Instead CEQA requires that if a nonelected official or decisionmaking body determines a project is exempt from CEQA, the agency must allow for an appeal of that determination to the agency's elected decisionmaking body.  (§ 21151, subd. (c).)  The Guidelines also provide the "local lead agency may establish procedures governing such appeals."  (Guidelines, § 15061, subd. (e).)  As recently explained in *Schmid v. City and County of San Francisco* (2021) 60 Cal.App.5th 470 (*Schmid*), CEQA itself does not "preempt" any local administrative appeal process, but rather "expressly contemplate[s] that '[a] local lead agency may establish [its own] procedures.' "  (*Id.* at pp. 492-493.)

Several cases recognize that when an agency elects to adopt an administrative appeal process, the common law rule requiring the exhaustion of administrative remedies applies to CEQA litigation and the scope of the remedy is "determined by the procedures applicable to the public agency in question."  (*Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 592, fn. 6)  Thus, "whether the exhaustion doctrine applies depends on the relevant procedures available in a specific jurisdiction."  (*California Clean Energy Committee v. City of San Jose* (2013) 220 Cal.App.4th 1325, 1345).  Where an appeal process is available and a party fails to exhaust its administrative remedies, it may not bring a judicial

---

[12]  Section 21177 provides that an action or proceeding alleging an agency failed to comply with CEQA shall not be brought unless (1) the alleged grounds for noncompliance "were presented to the public agency orally or in writing by any person during the public comment period provided by [CEQA] or before the close of the public hearing on the project before the issuance of the notice of determination" and (2) the person bringing the action "objected to the approval of the project orally or in writing during the public comment period provided by this division or before the close of the public hearing on the project before the filing of notice of determination."  (*Id.* at subds. (a), (b).)

action challenging the environmental determination. (*Clews*, *supra*, 19 Cal.App.5th at p. 187.)

In *Schmid*, *supra*, 60 Cal.App.5th 470, the court discussed the application of the common law rules regarding exhaustion of administrative remedies as applied to an exemption determination. There, the First District considered a challenge to a decision by the City and County of San Francisco (City of San Francisco) to remove a controversial statue. (*Id.* at pp. 476-477.) Similar to the process at issue in this appeal, the City of San Francisco provided that a staff determination that a project is exempt from CEQA could be appealed to the elected Board of Supervisors. (*Id.* at p. 492.) The challenger asserted that the City of San Francisco violated CEQA after staff determined the project was exempt before the project was ultimately approved, but the appellate court held that the claim was barred because the appellant failed to exhaust his administrative remedies. (*Id.* at p. 490.) The First District concluded that by ignoring the administrative appeal requirements, the appellant "failed to exhaust administrative remedies and sacrificed his right to bring a CEQA cause of action." (*Id.* at p. 492; see also *Stop Syar Expansion v. County of Napa* (2021) 63 Cal.App.5th 444, 456-457 [where agency creates an administrative appeal process for CEQA determinations, a challenger bears the burden of demonstrating it exhausted that remedy before seeking judicial review].)

In accord with a lead agency's authority to establish its own administrative appeal process, section 112.0520(b) of the Municipal Code provides that a person wishing to challenge an "*environmental determination*" not made by the City Council must file an application to appeal within 10 business days of the determination. Municipal Code section 113.0103 clarifies that an "*environmental determination*" includes a

determination that a project is exempt from CEQA under section 15061, subdivision (b) of the Guidelines.

Here, the City provided notice that it made an environmental determination on July 10, 2018, that the Exempt Projects were exempt from CEQA and that any application to appeal had to be filed by July 24, 2018.[13] McCann concedes she did not file an administrative appeal. Because she did not avail herself to the administrative appeal remedies offered by the City to address her concerns regarding the environmental determination she failed to exhaust her administrative remedies and the trial court correctly found that she is now barred from bringing a judicial action to challenge that determination.[14]

To avoid application of the exhaustion doctrine, McCann maintains posting the Notice of Right to Appeal the exemption determination

---

[13]   As we discuss *post*, McCann challenges the sufficiency of that notice.

[14]   In *Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281 our Supreme Court concluded that when a local agency voluntarily elects to provide an opportunity for public comment before an exemption determination is made, section 21177 applies "as long as the public agency gives notice of the ground for its exemption determination, and that determination is preceded by public hearings at which members of the public had the opportunity to raise any concerns or objections to the proposed project." (*Id*. at p. 291.) Although the local administrative appeal process addressed in *Tomlinson* provided for a public hearing before an exemption determination is made, and the process the City has adopted here does not, we are satisfied the City's process complies with the principles discussed in *Tomlinson*, including the Supreme Court's reaffirmation of the "common law doctrine requiring exhaustion of administrative remedies before bringing a court action." (*Ibid*.) Here, the City provided an appeal to the City Council, allowing for a public hearing to challenge the exemption determination, and thus facilitated a resolution of environmental determination disputes well before the project proceeded to a public hearing to consider project approval.

(1) violated constitutional due process principles; (2) failed to comply with CEQA; and (3) improperly bifurcated the environmental determination process. We see no merit in these contentions.

In her constitutional claim, McCann argues the posting of the Notice of Right to Appeal on the City's website and sending e-mails to every city councilmember and local planning groups failed to comply with due process principles. Instead she contends the City was required to provide notice that was reasonably calculated to reach every impacted homeowner. To support this contention, she relies on *Horn v. County of Ventura* (1979) 24 Cal.3d 605 (*Horn*). There, the Supreme Court discussed the application of due process principles to the notice and hearing requirements that apply "before governmental deprivation of a significant property interest." (*Id.* at p. 612.) The Court in *Horn* did not specifically define the scope of significant property interests, but relied on a prior opinion to explain that the constitutional rights to notice and a hearing applied to "land use decisions which 'substantially affect' the property rights of owners of adjacent parcels," *not* "agency decisions having only a de minimus effect on land."[15] (*Id.* at pp. 615-616.)

_____

[15] *Horn* also clarified that only "adjudicatory" decisions required notice and a hearing, not "legislative" decisions. (*Horn, supra,* 24 Cal.3d at pp. 612-613.) McCann does not address this distinction, but we note that multiple courts have held a finding that a project is exempt from CEQA, which does not require a hearing or a specific consideration of evidence, is quasi-legislative in nature, not adjudicatory. (See *Great Oaks Water Co. v. Santa Clara Valley Water Dist.* (2009) 170 Cal.App.4th 956, 968; *Bus Riders Union v. Los Angeles County Metropolitan Transportation Agency* (2009) 179 Cal.App.4th 101, 106; *Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 693; see also *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566-567.)

Here, the determination that the projects are exempt from CEQA was not a land use decision and did not deprive McCann of any significant property interest. As we discuss, an environmental determination is an entirely distinct decision from the actual project approval. The Supreme Court recognized this distinction in *Horn*, noting that while the CEQA notices for the environmental determination related to the project at issue were adequate "to encourage the generalized public participation in the environmental decision making contemplated by CEQA, they are inadequate to meet due process standards where fundamental interests are substantially affected." (*Horn*, *supra*, 24 Cal.3d at pp. 617-618; see also *Oceanside Marina Towers Assn. v. Oceanside Community Development Com.* (1986) 187 Cal.App.3d 735, 746, fn. 8 [recognizing that *Horn* applies to project approval but does not apply to CEQA determinations, which do not involve a deprivation of property rights].) McCann fails to cite any authority that *Horn* applies to notice of a determination by a nonelected official that a project is categorically exempt—as distinct from notice of a land use decision itself—and we see no basis for extending *Horn* in that manner.

McCann also fails to establish that the exemption determination (or the related undergrounding project) would result in a "significant" or "substantial" deprivation of her property rights. (*Horn*, *supra*, 24 Cal.3d at p. 616.) McCann chiefly complains of transitory effects on her property caused by construction, not a permanent deprivation of her property interests. Her concerns about the placement of transformer boxes closely mirrors the petitioners' concerns in *Robinson v. City and County of San Francisco* (2012) 208 Cal.App.4th 950 regarding wireless communication boxes. (*Id.* at p. 963.) In that case, the First District considered *Horn*, but dismissed the concerns over de minimis effects and held that as a matter of

23

law, adding small utility boxes in a developed urban area "does not result in a ' "significant" or "substantial" deprivation[ ] of property' so as to trigger constitutional due process rights." (*Ibid.*)

Similarly, in *Taxpayers for Accountable School Bond Spending v. San Diego Unified School District* (2013) 215 Cal.App.4th 1013 (*Taxpayers*), this court rejected the application of *Horn* to a school board's determination that the installation of large athletic field lights was exempt from CEQA. (*Id.* at pp. 1058-1059.) We concluded that "the appearance of tall light standards, along with occasional evening events involving some light trespass and additional traffic, could not, as a matter of law, result in a significant deprivation of a property interest in the circumstances of this case. *Horn* does not persuade us District was required to provide neighboring property owners with reasonable notice and an opportunity to be heard on the Board's proposed exemption action." (*Id.* at p. 1059.) We see no reason to depart from our reasoning in *Taxpayers* that the impacts associated with projects like the stadium lights in *Taxpayers* and the utility undergrounding in this case do not require individualized notice beyond that required by CEQA. Although we recognize the inconvenience of construction activity may interrupt residents for a short period of time and the transformer boxes in the public right of way may be considered less than ideal, the activities here do not deprive McCann and other residents of a significant property interest. Thus, *Horn* does not apply and the City's notice did not violate McCann's due process rights.

Beyond her reliance on *Horn*, McCann fails to address what procedural due process requirements may apply to an administrative appeal of a CEQA determination. We do not dispute that the doctrine of exhaustion of administrative remedies applies only when the remedy itself comports with

24

the requirements of due process. (See, e.g., *Bockover v. Perko* (1994) 28 Cal.App.4th 479, 486.) However, as we have previously recognized in the CEQA context, " '[d]ue process . . . "does not require any particular form of notice or method of procedure. If the [administrative remedy] provides for reasonable notice and a reasonable opportunity to be heard, that is all that is required [for due process]. [Citations.]" ' " (*CREED-21 v. City of San Diego* (2015) 234 Cal.App.4th 488, 517.)

Absent authority to the contrary, we are satisfied that the City's noticing requirements provide adequate notice because they comport with the general noticing requirements the Legislature has deemed sufficient for other CEQA determinations. CEQA requires nothing more for a notice of intent to adopt a negative declaration than a single publication in a newspaper and a 20-day public review period. (Guidelines, §§ 15072, subd. (b), 15073, 15105.) The same publication requirement applies for the circulation of a draft EIR before it is considered for certification, with a 30-day review period. (Guidelines, §§ 15087, subd. (a), 15073, 15105.) Similarly, following an agency's decision to adopt or certify a negative declaration or EIR, CEQA only requires that the notice be filed in the county clerk's office and be available for public inspection. (Guidelines, §§ 15075, 15094.)

Our Supreme Court has expressly declined to "impose additional requirements for a [notice of determination] beyond those described in the Guidelines." (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 53, citing *Lee v. Lost Hills Water Dist.* (1978) 78 Cal.App.3d 630, 634 [rejecting contention that "due process requires . . . more or better notice than that prescribed by the [CEQA] statute."].) McCann fails to offer any argument, beyond her misplaced reliance on *Horn*, that we should find CEQA's noticing provisions to be

incompatible with constitutional due process requirements. We are satisfied that the City's administrative appeal noticing requirements, which require (1) posting of the notice of right to appeal in a public location and on the Internet, and (2) distribution by e-mail to all city councilmembers and the community planning groups that represent the areas in which a project is proposed, are consistent with CEQA's noticing provisions and provide adequate notice for due process purposes. Here, the City provided sufficient notice by complying with these requirements when it posted the notice in a public office, on the City's website, and e-mailed the notice to the city councilmembers and community planning groups, including McCann's city councilmember and the community planning group representing her Kensington neighborhood.

Alternatively, McCann asserts that even if the noticing requirements pass constitutional muster, she should be excused from exhausting her administrative remedies because the City's noticing process was inadequate under CEQA. She does not cite any provision in CEQA or the Guidelines that requires specific noticing that an agency has determined a project is exempt. Instead, McCann mistakenly relies on two decisions (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 501 and *Coalition for Clean Air v. City of Visalia* (2012) 209 Cal.App.4th 408) which did not involve a "notice of right to appeal," but rather discussed the distinct requirements under CEQA regarding a "notice of exemption."

A "notice of right to appeal" is a different document than a "notice of exemption." Pursuant to Municipal Code section 112.0310(a), a "notice of right to appeal" is filed when City staff determines a project is exempt from CEQA. (*Ibid.*) The notice is intended to inform interested parties that they may file an administrative appeal of the determination. (*Ibid.*) By contrast,

26

a "notice of exemption," discussed in section 15062 of the Guidelines, is not a part of any *administrative appeal process*. Instead, an agency *may* file a "notice of exemption" following project approval to start a 35-day statute of limitations period to file a *legal challenge* to an agency's decision that the project is exempt from CEQA. (§ 21167, subd. (d); Guidelines, § 15062, subd. (d).)[16]

In short, the City's "notice of right to appeal" alerts parties to the right to file an *administrative appeal*, whereas a "notice of exemption" alerts parties of the shortened time frame in which to file a *legal action* challenging the CEQA determination. Here, the City filed notices of exemption for the Exempt Projects *after the projects were approved by the City*. Those notices were proper and triggered the 35-day filing deadline to file a legal challenge, but they are also distinct from the Notice of Right to Appeal filed by the City. McCann's claim that the City violated the procedures for notices of exemption

_____

[16] The notice of exemption shall be filed with the county clerk for posting for a period of 30 days and agencies are encouraged, but not required, to post the notice on the Internet. (Guidelines, § 15062, subd. (c)(2), (3).) Nothing in CEQA or the Guidelines requires individualized notice. A "notice of exemption" may be prepared by staff when the exemption determination is made, but it may not be filed until after the project is approved. (Guidelines, § 15062, subd. (b).) This ensures that a party is not required to file a legal challenge to the environmental determination before the project is approved.

is not only mistaken, but it also has no bearing on whether the City's Notice of Right to Appeal was properly noticed.[17]

Both CEQA and the common law doctrine of exhaustion of administrative remedies required McCann to avail herself to the City's administrative appeal process to preserve her legal challenge to the City's determination that the projects are exempt from CEQA. She failed to do so and does not establish a basis for excusing her failure to exhaust administrative remedies. Accordingly, as the trial court found, McCann's challenge to the Exempt Projects is barred.

Finally, McCann argues she was not required to pursue an administrative appeal because the City improperly bifurcated its decision process by allowing staff to make the environmental determination that the projects were exempt despite the requirement that the City Council approve the projects themselves. We disagree.

In *Clews, supra*, we upheld the City's administrative appeal process and held that it did not result in an improper "bifurcation." (19 Cal.App.5th at pp. 184-191.) As we explained in *Clews,* for each project that potentially falls under CEQA's purview, the City must (1) consider the environmental impact, and (2) approve the actual project. (*Clews, supra,* 19 Cal.App.5th at pp. 185-186.) The "environmental determination," defined by the City as the

_____

17    In her reply brief, McCann contends the City failed to comply with its Municipal Code by not sending a "Notice of Public Hearing" before making its finding that the projects were exempt. McCann made a passing reference to the relevant code section in her opening brief, but made no argument that the alleged violation by staff was an independent basis for finding notice to be inadequate. Although this argument appears to be premised on a misinterpretation of the relevant code section, the issue is forfeited and we need not address claims not properly addressed in the opening brief. (See, e.g., *Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1542.)

28

decision that a project is either exempt from CEQA or instead requires the adoption of a negative declaration or certification of an EIR, is entirely distinct from the decision to approve a project. Although the same decisionmaking person or body often considers both the environmental determination and project approval, the City's process allows for staff to determine a project is exempt from CEQA while a different decisionmaking body later considers project approval.

This bifurcated process is permitted by CEQA. Specifically, section 15025, subdivision (a), of the Guidelines permits a public agency to delegate certain CEQA functions to staff, including the determination a project is exempt. In section 15022, subdivision (a)(9), the Guidelines direct public agencies to ensure that the decision-making body that will approve a project also review and consider "environmental documents," but the Guidelines also clearly define "environmental documents" as *not* including an exemption determination. (Guidelines, § 15361.) At most, where an agency elects to use a bifurcated process, CEQA requires that staff environmental decisions can be appealed to the elected decisionmaking body. (§ 21151, subd. (c).)

McCann mistakenly relies on decisions involving MNDs and EIRs to support her claim that the City's process for exemptions was improper. We do not dispute that a person or body that does have authority to approve the project is not permitted to (1) review and consider a final EIR or approve a negative declaration, or (2) make findings pursuant to sections 15091 and 15093. (Guidelines, § 15025, subd. (b)(1), (2).) Where these limitations exist, the agency may not bifurcate the environmental determination from project approval. (*Clews*, *supra*, 19 Cal.App.5th at p. 187.) Because, here, the City was not considering an EIR or an MND and was not making findings required by sections 15091 or 15093 (which arise only in the context of an

29

EIR), the City was permitted to delegate to staff authority to determine the project was exempt.[18]  For this reason, McCann's reliance on *California Clean Energy Committee v. City of San Jose* (2013) 220 Cal.App.4th 1325, which held that a non-decisionmaking body may not certify an EIR, is misplaced.  (*Id.* at pp. 1340-1341.)

Nothing in the Guidelines prevents a public agency from delegating authority to staff to determine a project is exempt from CEQA and then make a different decisionmaking body responsible for subsequently approving the project.  The City properly delegated to staff the authority to make the determination under CEQA that the projects were exempt and established a procedure to appeal that decision to the City Council.  Seeing no error in the City's process, McCann fails to establish any excuse to her failure to exhaust her administrative remedies.

## C.    The MND Projects

### 1.    The City Did Not Violate CEQA by Improperly Segmenting the MND Projects

Turning to the MND Projects, McCann asserts the City violated CEQA by segmenting the utility underground projects rather than considering the projects as one citywide project.  Generally, an agency may not improperly split a project into separate segments to avoid consideration of the

---

18    In *Clews*, we analyzed whether the City's process for a project involving an MND involved an improper bifurcation.  (*Clews*, *supra*, 19 Cal.App.5th at p. 187.)  Relying on section 15025, subdivision (b) of the Guidelines, we recognized that a City may not delegate the adoption of an MND to staff who was not also tasked with approving the project.  (*Ibid*.)  *Clews* did not involve an exempt project and to the extent it implicitly suggests that an exemption determination may not be bifurcated from project approval, any such implication was mere dicta.

cumulative environmental impacts of a project.  " 'There is no dispute that CEQA forbids "piecemeal" review of the significant environmental impacts of a project.' [Citation.]  Rather, CEQA mandates 'that environmental considerations do not become submerged by chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences.' [Citation.]  Thus, the Guidelines define 'project' broadly as 'the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . .' (Guidelines, § 15378, subd. (a).)  The question of which acts constitute the 'whole of an action' for purposes of CEQA is one of law, which we review de novo based on the undisputed facts in the record." (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 98.)

In *Laurel Heights Improvement Association v. Regents of the University of California* (1988) 47 Cal.3d 376, the California Supreme Court concluded that to avoid piecemealing, an agency's environmental review of a project under CEQA must address all aspects of a project that are a "reasonably foreseeable consequence" of the project and would be "significant" such that "it will likely change the scope or nature of the initial project or its environmental effects."  (*Id.* at p. 396.)  Similarly, "[s]ome courts have concluded a proposed project is part of a larger project for CEQA purposes if the proposed project is a crucial functional element of the larger project such that, without it, the larger project could not proceed." (*Communities for a Better Environment v. City of Richmond*, *supra*, 184 Cal.App.4th at p. 99.)

Here, each utility undergrounding project was independently functional and did not rely on any other undergrounding project to operate.  Assuming

31

no future undergrounding project occurs, it would not affect the functionality of the MND Projects. Similarly, if those future projects do occur, they would not materially change the function or scope of the MND Projects. Thus, although the City has expressed an intent to pursue similar projects in other neighborhoods, the MND Projects are not necessarily part of a larger interdependent project.

Although similar in nature, each undergrounding project stands alone such that it is not the "first step" toward additional projects and does not "legally compel[] or practically presume[] completion of another action." (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1223.) Different projects "may properly undergo separate environmental review (i.e., no piecemealing) when the projects . . . can be implemented independently." (*Ibid.*) Here, each MND Project is an independent project that does not rely on future projects. Thus, we conclude the City did not err in defining the scope of the MND Projects for purposes of environmental review.

### 2. The City's Description for the MND Projects Was Adequate

McCann also asserts the City improperly deferred its decision on the precise location of the transformer boxes, which she contends precluded the City from considering the environmental impacts of the MND Projects in their entirety. The first step of the CEQA process requires agencies to determine whether an activity is a "project" subject to CEQA. (*Muzzy Ranch, supra,* 41 Cal.4th at pp. 379-380.) As part of this process, the agency must also provide an accurate and complete description of the "project." (*Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1448.) " 'Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its

environmental cost, consider mitigation measures, assess the advantage of terminating the proposal (i.e., the "no project" alternative) and weigh other alternatives in the balance.  An accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR.' [Citation.] The description should not, however, 'supply extensive detail beyond that needed for evaluation and review of the environment impact.' " (*Ibid.*)

Regarding the location of the transformers, McCann asserts that "[t]he primary issue in this case is whether a public agency may properly defer disclosure and design of the *most controversial aspect* of the project until after the project is approved and the project is no longer subject to challenge under CEQA." (Italics added)  Nothing in CEQA, however, requires an agency to focus on "controversy." (*Georgetown Preservation Society v. County of El Dorado* (2018) 30 Cal.App.5th 358, 374 (*Georgetown*) ["the mere existence of a public controversy does not satisfy the fair argument standard"].)  Indeed, it is entirely possible, if not common, for a controversial or unpopular project to be exempt from CEQA.  Neighborhood sentiment is not an impact that must be directly considered in the environmental determination process.  (See, e.g., *Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 579 ["CEQA does not require an analysis of subjective psychological feelings or social impacts"].)  Instead, CEQA requires an agency to focus on the aspects of a project that may have an impact on the physical environment.  (*Ibid.*)

As applied here, the City's position is that regardless of the precise location of each transformer, the environmental impact of the projects is the same.  On appeal, McCann's arguments accept this premise.  As we discuss *post*, she argues that regardless of where the transformers are placed, they will impact the aesthetics of the neighborhood.  Thus, although McCann and some property owners may have strong opinions regarding the location of the

transformers in front of their individual homes, she fails to establish that the precise location is critical to considering the generalized environmental impact of the projects.

The MND reveals that the relevant portions of the projects, including the transformers, will be constructed in the public right-of-way unless a voluntary private easement is secured. Existing trees within the right-of-way will be protected unless removal is reasonably necessary, implying that the boxes will not be placed in the same location as existing trees unless it is necessary to do so. Accepting these limited constraints on the location of the transformers, the City could reasonably consider the environmental impacts of the projects.

### 3. Substantial Evidence Does Not Support a Fair Argument that the MND Projects Would Have a Significant Aesthetic Impact

Relatedly, McCann contends that the record contains substantial evidence to support a fair argument that the MND Projects will have a significant effect on the environment due to aesthetic concerns and thus the City was required to prepare an EIR. McCann does not make a sufficient showing to support this argument. The consideration of aesthetic impacts under CEQA arises for projects that have a significantly larger impact than the transformers at issue here. When considered in the context of existing case law, the aesthetic impact of the transformers falls far short of the significant impact needed to trigger the need for an EIR.

In reviewing the adoption of the MND, we must determine whether the record contains substantial evidence supporting a "fair argument" that the projects will have a significant impact on the environment. (*Clews*, *supra*, 19 Cal.App.5th at p. 192.) If an appellant demonstrates that substantial

evidence of an unmitigated impact exists, then we must conclude the City abused its discretion by not preparing an EIR. (*Ibid.*)

As the appellant, McCann bears the burden of identifying substantial evidence in the administrative record to support a fair argument that the projects may have a significant impact that is not mitigated. (*Clews*, *supra*, 19 Cal.App.5th at p. 193.) " '[S]ubstantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact.' (§ 21080, subd. (e)(1).) 'Substantial evidence is not argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute to, or are not caused by, physical impacts on the environment.' (§ 21080, subd. (e)(2).) 'The existence of public controversy over the environmental effects of a project shall not require preparation of an environmental impact report if there is no substantial evidence in light of the whole record before the lead agency that the project may have a significant effect on the environment.' (§ 21082.2, subd. (b).) 'Relevant personal observations of area residents on nontechnical subjects may qualify as substantial evidence . . . . [Citations.] So may expert opinion if supported by facts, even if not based on specific observations as to the site under review.' " (*Id.* at p. 192.)

McCann asserts that the MND Projects will have a significant impact on the community's aesthetics. The majority of McCann's arguments concerning aesthetics are centered specifically on her own Kensington neighborhood, which she suggests contains numerous historical resources, unique streetscapes devoid of "industrial elements," and trees she describes as "heritage trees." As discussed *ante*, Kensington falls within a district under the Exempt Projects, not the MND Projects. In light of our conclusion

that she failed to exhaust her administrative remedies, we do not consider her challenge to the adequacy of the determination that those projects were exempt from CEQA.

Nevertheless, she raises a generalized claim regarding the aesthetics of the undergrounding projects as applied to one neighborhood, Normal Heights, encompassed in the MND Projects. McCann contends that "having above ground transformers placed on the streets, sidewalks or yards" and the removal of mature trees would have "significant aesthetic impacts." To support this contention as applied to the Normal Heights neighborhood, she cites the testimony of a commenter at the City Council hearing. That commenter, who asserted he was representing a larger group, spoke in favor of the undergrounding projects but expressed a preference to have the transformers placed in the alleys. He also noted that if the boxes were placed on the street, the boxes may become "a graffiti magnet." McCann asks us to rely on this testimony from a community member to find that the record supports a fair argument that the transformers would have a significant aesthetic impact warranting the preparation of an EIR.

The City does not dispute that, generally speaking, lay opinion from the community regarding a project's aesthetic impact may provide substantial evidence to support a fair argument that a project may have a significant impact of the environment, triggering the need to prepare an EIR. (See, e.g., *Georgetown, supra,* 30 Cal.App.5th at p. 363.) However, cases frequently note that individualized claims of aesthetic impact do *not* constitute substantial evidence. (See, e.g., *Taxpayers, supra*, 215 Cal.App.4th at p. 1042; *Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 903 [vague complaints by two speakers regarding project's aesthetics do not constitute substantial

36

evidence].)  Even cases that rely on community opposition as a basis to find substantial evidence supporting a fair argument recognize that "a few stray comments" or "expressions of concern by one or two people" are not enough to constitute substantial evidence.  (*Georgetown*, at p. 375; *Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 403 (*Ocean View Estates*).)

Here, McCann relies on a comment by a single speaker, along with her own comments and those of her attorney, regarding a small portion of the MND Projects to support her claim that substantial evidence supports a fair argument that the projects would have a significant impact on the aesthetics of the neighborhood.  This is not enough to meet her burden of demonstrating that *substantial* evidence supports her claim.

Regardless, even assuming the limited comments in the administrative record did constitute substantial evidence, McCann fails to establish those comments support a fair argument of a significant aesthetic impact caused by the transformers at issue here.

"Appendix G of the Guidelines provides a model environmental checklist for an initial study under CEQA.  Under the category of aesthetics, (capitalization omitted) appendix G directs the lead agency to analyze whether the project would (1) have a substantial adverse effect on scenic vista; (2) substantially damage scenic resources, including but not limited to, trees, rock outcroppings, and historic buildings within a state scenic highway; (3) substantially degrade the existing visual character or quality of the site and its surroundings; and (4) create a new source of substantial light or glare which would adversely affect day or nighttime views in the area.  (Guidelines, appen. G, § I.)" (*Preserve Poway v. City of Poway*, *supra*, 245 Cal.App.4th

560, 578.) Here, the City's initial study checklist mirrored the Guideline's model checklist.

McCann does not contend the short transformer boxes would affect any scenic vista, damage scenic resources, or create a new source or light or glare. Instead, she focuses on the effect the boxes would have on the "look and feel" of "quaint" residential neighborhoods. She fails, however, to cite any case law finding that such small structures, measuring only three feet tall, would cause a significant aesthetic impact by *substantially* degrading the existing visual character of the neighborhood.

In *San Francisco Beautiful v. City and County of San Francisco* (2014) 226 Cal.App.4th 1012 (*San Francisco Beautiful*), the court concluded that concerns about the aesthetic impact of over 700 utility boxes in the urban environment of San Francisco was insufficient to establish a fair argument that the boxes would have a significant environmental impact. (*Id.* at pp. 1027-1028.) We do not disagree with McCann that the impact of utility boxes in the context of San Francisco may be distinguishable from the impact of utility boxes in the purportedly "quaint" neighborhoods involved in this case. However, although *San Francisco Beautiful* considered the impact of utility boxes in an urban environment full of similar utility boxes, it also considered the impact of a project to add *over 700* such boxes, far more than would be installed as part of the MND Projects. Despite these differences, the decision in *San Francisco Beautiful* supports a general conclusion that utility boxes will not necessarily have a significant aesthetic impact.

Other decisions bolster our conclusion that the transformers will not have a significant impact. In *Taxpayers*, *supra*, 215 Cal.App.4th 1013, this court considered the petitioner's argument that the aesthetic impact of multiple athletic field lighting poles measuring approximately 100 feet in

38

height necessitated an EIR. (*Id*. at pp. 1038-1039.) We rejected the claim that the visual impact of these relatively large poles and the associated bright lights would constitute a significant effect on the environment based on the petitioner's claims that they were to be installed in the neighborhood of Talmadge, which was described in terms similar to McCann's description of the neighborhoods involved in this case. (*Id*. at p. 1042.) A three-foot-tall transformer box has a significantly smaller impact than a 100-foot-tall pole topped with bright lights.

McCann relies on other cases to support her claim regarding aesthetic impacts, but these cases reveal that a potential significant aesthetic impact is usually found in projects involving large buildings or structures, often in rural or undeveloped areas. In *Georgetown*, *supra*, the project at issue was a large commercial building spanning three lots in a "quaint" hamlet in a rural county. (30 Cal.App.5th at p. 363.) In *Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, the court held that the record supported a fair argument that a project consisting of over one hundred homes built on an undeveloped, 20-acre parcel would have a significant aesthetic impact. (*Id*. at pp. 908-910, 937-939.) In another case not cited by McCann, the appellate court held that the petitioners successfully established a fair argument that an aluminum roof covering a four-acre reservoir would have a significant impact on the aesthetics of a natural area with public views. (*Ocean View Estates, supra,* 116 Cal.App.4th at pp. 398, 402-403.)

Each of these decisions considered projects entirely distinguishable from the three-foot-tall transformer boxes at issue here. Even assuming the transformers could not be unobtrusively placed in alleys and may occasionally attract graffiti, McCann's own counsel noted they would be placed in what he referred to as the "devil's strip" of landscaping between the

sidewalk and curbside parking. McCann's own photographs, submitted as attachments to her declarations, support the inference that the transformers placed in this "devil's strip" would often be hidden from view behind parked cars or obscured by tree trunks or landscaping. Although some of the neighborhoods at issue in this case may not be as dense as the parts of San Francisco, there is no dispute that each neighborhood is a developed urban area similar to other neighborhoods in the City.

While aesthetic impacts must not be ignored under CEQA, we also see no reason to believe that CEQA requires an EIR to evaluate the aesthetic impact of small, three-foot cubes placed next to the street in a developed neighborhood. (See, e.g., *Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 592 ["[W]e do not believe that our Legislature in enacting CEQA . . . intended to require an EIR where the sole environmental impact is the aesthetic merit of a building in a highly developed area. [Citations.] To rule otherwise would mean that an EIR would be required for every urban building project that is not exempt under CEQA if enough people could be marshaled to complain about how it will look."].)

McCann also mentions the possible removal of trees as having a significant aesthetic impact. Although she acknowledges that the City offered assurances that "tree removal is unlikely," she suggests that the mere possibility that a tree may be cut down requires an EIR. This argument ignores the existing city policy that requires, whenever possible, that the City "replace trees that are removed." The fact some trees may be trimmed or need to be replaced by a tree in another location is not enough to establish a *significant* aesthetic impact. McCann fails to establish that the record

contains substantial evidence to support a fair argument the projects would have a significant impact on the environment.[19]

### 4. The City's Determination that the MND Projects' Greenhouse Gas Emissions Are Not Significant Is Not Supported by Substantial Evidence.

McCann asserts that the City's finding that the projects would have no significant impact due to greenhouse gas emissions was not supported by substantial evidence such that the City erred in adopting the MND. We agree.

### a. CEQA's Requirement to Consider Greenhouse Gas Emissions

Over the past two decades, the State of California has expressed a growing commitment to addressing climate change. Beginning in 2006, the Legislature passed legislation that instituted a series of statewide goals to significantly reduce greenhouse gas emissions as part of the effort to combat climate change.[20] (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 488-489 (*Golden Door*).) To implement this broad state policy, CEQA was amended in 2007 to require the "preparation, adoption and periodic update of guidelines for mitigation of greenhouse gas impacts." (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 217 (*Center for Biological Diversity*).)

---

[19] McCann also challenges the impact of tree removal on the City's effort to reduce greenhouse gas emissions. We discuss this contention in the subsequent section of this opinion.

[20] " 'Greenhouse gases absorb infrared radiation and trap the heat in the Earth's atmosphere, rather than allowing the radiation to escape into space. . . .' " (*Golden Door*, *supra*, 50 Cal.App.5th at p. 484.)

41

The resulting Guidelines, adopted in 2010, included a new requirement for lead agencies to "describe, calculate or estimate" the amount of greenhouse gases a project will emit. (Guidelines, § 15064.4, subd. (a); see also *Center for Biological Diversity*, *supra,* 62 Cal.4th at p. 217; *Golden Door*, *supra*, 50 Cal.App.5th at p. 484.) Section 15064.4 of the Guidelines grants each lead agency broad discretion to determine significance thresholds and does not mandate any one particular method to address greenhouse gas emissions. (*Center for Biological Diversity*, at pp. 217, 221-222.)

As the Supreme Court recognized in *Center for Biological Diversity*, the unique challenges of climate change place a heavy burden on local agencies to determine whether any particular project's greenhouse gas emissions are "significant" under CEQA. (*Center for Biological Diversity*, *supra,* 62 Cal.4th at pp. 219-220.) "The challenge for CEQA purposes is to determine whether the impact of the project's emissions of greenhouse gases is *cumulatively* considerable, in the sense that 'the incremental effects of [the] individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects.' " (*Id.* at p. 219.)

Section 15183.5 of the Guidelines eases the burden on local agencies to consider the significance of every project's individualized greenhouse gas emissions by creating a procedure that allows for the adoption of broad "greenhouse gas emission reduction plans," which provide a basis for the tiering, or streamlining, of subsequent project-level CEQA analysis. (*Center for Biological Diversity*, *supra,* 62 Cal.4th at p. 230.) Often referred to as "climate action plans," such plans "may, if sufficiently detailed and adequately supported, be used in later project-specific CEQA documents to

simplify the evaluation of the project's cumulative contribution to the effects of greenhouse gas emissions." (*Ibid.*)

In other words, an agency may adopt a comprehensive plan to make defined reductions in a region's greenhouse gas emissions that are collectively sufficient to meet the reduction targets set by the state. Thereafter, the agency may fulfill its duty under CEQA to consider the significance of an individual project's greenhouse gas emissions by analyzing whether the project is consistent with the broader plan. If a project is found to be consistent with the broad plan, that finding provides sufficient evidence for the agency to conclude the project has no significant impact due to greenhouse gas emissions.

### b. The City's Procedure for Analyzing Greenhouse Gas Emissions

In compliance with the change in state law, the City began to analyze every project's greenhouse gas emissions as part of the environmental review process. For earlier utility undergrounding projects, documents in the administrative record suggest that the environmental review involved a calculation of the expected greenhouse gas emissions for each project and a reference to statewide standards to determine whether the project would have a significant impact. So long as a project would result in less than 900 metric tons of greenhouse gas emissions, the City would conclude a project would have no significant impact.

In 2015, the City adopted a greenhouse gas reduction plan to provide for streamlined review rather than calculating the emissions from each individual project. This reduction plan, known as the Climate Action Plan or "CAP," provides a detailed outline of the specific actions the City "will undertake to achieve its proportional share of State greenhouse gas (GHG) emission reductions." Using 2010 as the baseline year, the Climate Action

Plan committed the City to reducing all cumulative greenhouse gas emissions in the City by 15 percent by 2020, 40 percent by 2030, and 50 percent by 2035. To achieve these goals, the City committed to a total reduction of 10,428,926 metric tons of "$CO_2e$," or carbon dioxide equivalents, by 2035.[21]

To meet this overall goal, the Climate Action Plan sets forth five broad strategies, each consisting of a range of specific actions, to reduce the cumulative greenhouse gas emissions within City limits. These five strategies commit the City to (1) requiring energy and water efficient buildings; (2) providing clean and renewable energy; (3) shifting transportation strategies to deemphasize automobiles; (4) achieving "zero waste" in city landfills; and (5) ensuring "climate resiliency" to deal with the shocks of a changing climate. The City calculated the quantifiable greenhouse gas reductions for each of these strategies to reach its overall reduction goal. As one example of a specific action, the Climate Action Plan's "climate resiliency" strategy commits the City to, inter alia, consider an "Urban Tree Planting Program" to achieve the goal of having 15 percent of the City covered by an "urban tree canopy" by 2020. The City estimates that this program, if implemented, would result in a reduction of 43,839 metric tons of $CO_2e$. The Climate Action Plan includes 17 such actions within the five strategies to achieve the overall reduction goal.

As it relates to CEQA, the Climate Action Plan states the plan "will serve as a Qualified GHG Reduction Plan for purposes of tiering under CEQA." Relatedly, the City relies on the Climate Action Plan in its published document outlining the "thresholds of significance" that apply in the

---

[21] A "carbon dioxide equivalent" is a commonly used unit to quantify greenhouse gases, each of which has a different potential to trap heat in the atmosphere.

environmental review process.[22]  In that document, the City directs that when conducting its environmental review, staff must consider whether a project would "[c]onflict with the City's Climate Action Plan or another applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases[.]"

In conjunction with the Climate Action Plan, the City prepared a "Climate Action Plan Consistency Checklist" (Checklist) for the express purpose of allowing "project-specific environmental documents, if eligible, to tier from and/or incorporate by reference the [Climate Action Plan]'s programmatic review of GHG impacts in their cumulative impact analysis." The City notes that since July 1, 2016, the City has utilized the Checklist to determine whether a project is consistent with the Climate Action Plan and, by extension, whether an EIR is required.

The Checklist includes three possible steps.  The first step, labeled as "Land Use Consistency," asks whether the project is consistent with the City's land use and zoning regulations or would otherwise result in an equivalent or less "GHG-intensive" project than would be allowed under the zoning and land use regulations.  If the answer is "no," the project is generally determined to have a significant impact and an EIR would be required.

---

[22]  Section 15064.7 of the Guidelines encourages local agencies to develop and publish "thresholds of significance" that are used in the determination of the significance of environmental effects.  "A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, noncompliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant."  (Guidelines, § 15064.7, subd. (a).)

45

If the answer to the first step is "yes," the analysis proceeds to "Step 2." The second step requires an analysis of whether the project is consistent with "the applicable strategies and actions of the CAP." The Checklist, however, clarifies that "Step 2 only applies to development projects that involve permits that would require a certificate of occupancy from the Building Official or projects comprised of one and two family dwellings or townhouses . . . and their accessory structures." In a footnote, the CAP Checklist explains that several project types are *not* subject to the analysis under "Step 2," including "discretionary map actions," permits for wireless communication facilities, special event permits, use permits, and "non-building infrastructure projects such as roads and pipelines." Thus, if a project does not require a certificate of occupancy, staff does not complete the second step.[23] The Checklist includes a third step, not relevant here, that applies when a project proposes increased housing density not consistent with existing land use plans but within a "transit priority area." After it adopted the Checklist, the City changed its analysis for all discretionary projects to provide for streamlined environmental review.

---

[23] The Checklist specifies that for projects that do not require a certificate of occupancy, the City or project applicant must implement the "Best Management Practices" set forth in the "Greenbook." The Greenbook is not in the record, but it appears to simply detail basic standards for construction activity and is unrelated to the Climate Action Plan. The City refers to a related "Whitebook" in its respondent's brief with a link to a website for more information. Because the City does not ask us to take judicial notice of either document, and they are not in the record, we do not consider the linked website.

### c. The City's Analysis of the MND Projects' Consistency with the Climate Action Plan

During its initial study of the MND Projects, the City used the Checklist to determine whether the projects were consistent with the Climate Action Plan. In that analysis, it found under "Step 1" that the MND Projects were consistent with existing land use and zoning designations. Under "Step 2," the City explained that the step did not apply because the MND Projects did not require a certificate of occupancy. The City concluded that "[s]ince a utility line replacement project does not require a certificate of occupancy, the review is complete and the project is determined to be consistent with the CAP. The projects would therefore not cause any significant increase in GHG emissions, and no mitigation is required. Impacts would be less than significant." The record does not include any indication that the City conducted any other analysis of the impact of the MND Projects' greenhouse gas emissions.

### d. Analysis

In response to McCann's claim that the City failed to conduct the necessary analysis, the City relies on its completion of the Checklist and asserts that "[p]rojects that are consistent with the CAP *as determined through the use of this Checklist* may rely on the CAP for cumulative impacts analysis of GHG emissions." (Italics added.)

We agree with the City, based on the record before us, that projects that are consistent with the Climate Action Plan may rely on that plan for the required project-level analysis of the significance of cumulative

47

greenhouse gas emissions.[24]  Pursuant to section 15183.5 of the Guidelines, the City may determine that the impact from a project is not significant if it complies with the requirements for greenhouse gas emission reductions specified in the Climate Action Plan.  The City's existing policies require staff to review whether projects are consistent with the Climate Action Plan when conducting an environmental review under CEQA.  If staff determines a project is consistent with the Climate Action Plan, it may then conclude that the project has no significant impact due to greenhouse gas emissions, avoiding the need to prepare an EIR.  We see no error in this regard.

However, the City erred in using an inapplicable Checklist to determine the MND Projects' consistency with the Climate Action Plan.  The Checklist expressly states that it does not apply to projects that do not require certificates of occupancy, including the infrastructure projects at issue here, and staff skipped the consistency analysis for these projects.  Thus, the City never analyzed whether the MND Projects are consistent with the Climate Action Plan because the City's only existing tool does not address projects that do not require a certificate of occupancy.  The City may not conclude the projects are consistent with the Climate Action Plan simply by directing staff to skip the consistency analysis.

The City's distinction between projects that require a certificate of occupancy and projects that do not require a certificate of occupancy appears to have no rational basis.  In a footnote, the Checklist claims that Step 2 does not apply if no certificate of occupancy is required because "such actions

---

24    McCann does not dispute that the Climate Action Plan meets the requirements of section 15183.5 of the Guidelines and we assume, for purposes of this appeal, that the plan is sufficient to allow for streamlined CEQA review.

would not result in new occupancy buildings from which GHG reductions could be achieved." However, the record demonstrates that many of the Climate Action Plan's measures for greenhouse gas reductions apply to non-building projects, including utility projects like those at issue here. For example, the technical documents for the Checklist reveal that the Climate Action Plan identifies reduction measures including a "Smart Energy Management & Monitoring System," electrical vehicle charging, facilitating "onsite photovoltaic energy generation and energy storage systems," and a significant increase in street trees. Less directly, because the MND Projects would include changes to sidewalks, the potential loss of parking, and street resurfacing, the scope of the projects potentially invokes other measures in the Climate Action Plan related to electric vehicle parking and changes to public rights-of-way to enhance non-automotive transportation. Although the specifics of these measures are not before us, they arguably apply to infrastructure projects that do not require a certificate of occupancy.

If an infrastructure project conflicts with these measures, completing the Checklist would not reveal the inconsistency with the Climate Action Plan such that the Checklist cannot provide a basis for determining a project will not have a significant impact. Our conclusion is not meant to suggest that the use of a "checklist" to determine consistency with the Climate Action Plan is inappropriate. The City could amend its current Checklist to include a step to assess infrastructure projects or create a second checklist that applies only to infrastructure projects. All that is required is that the City analyze each project's consistency with the specific greenhouse gas reduction measures included in the Climate Action Plan. Until such an analysis is completed, it is impossible for the City to know the environmental impact of its infrastructure projects.

Thus, the City's MND determination is incomplete because it failed to analyze whether the projects were consistent with the Climate Action Plan and additional analysis is necessary before the City can properly certify the MND. Section 15183.5 of the Guidelines requires the City, as lead agency, to "identify those requirements specified in the [Climate Action Plan] that apply to the project, and, if those requirements are not otherwise binding and enforceable, incorporate those requirements as mitigation measures applicable to the project." (*Id.* at subd. (b)(2).) For projects falling outside the scope of the Checklist (like the infrastructure projects here) the City must consider whether the projects comply with each action identified in the Climate Action Plan if it wishes to avail itself to the streamlined review provided by section 15183.5 of the Guidelines. As part of that review, the City must identify the reduction measures that apply to the project and, if they are not otherwise binding and enforceable, include them as mitigation measures. (Guidelines, § 15183.5, subd. (b)(2).) As discussed above, several reduction measures may apply to the scope of work included in the MND Projects and each must be addressed in the MND before the City may determine the projects will have no significant impact.

An agency abuses its discretion under CEQA by reaching factual conclusions unsupported by substantial evidence. (*Golden Door, supra*, 50 Cal.App.5th at p. 504.) Without conducting the required analysis to determine consistency with the Climate Action Plan and identifying any applicable requirements, the City's determination that the projects would not have a significant impact as it relates to greenhouse gas emissions is not supported by substantial evidence. This omitted analysis precludes the City from considering whether each individual project is consistent with the Climate Action Plan and, more broadly, the full extent of the environmental

impact of the projects. Therefore, the City abused its discretion in adopting the MND.

Our conclusion, however, does not mean the City must necessarily complete an EIR. Nothing in the record before us supports a fair argument that the MND Projects are inconsistent with the reduction measures identified by the City in the Climate Action Plan. For this reason, McCann does not establish that the City was required to prepare an EIR.[25] Instead, the City must perform the required analysis to determine whether the MND Projects are consistent with the Climate Action Plan. If it finds the projects are consistent and includes all required mitigation measures, it may still avoid the need to prepare an EIR. However, if the analysis determines the projects are inconsistent with the Climate Action Plan and the projects cannot be revised or the impact cannot be mitigated, it will be required to prepare an EIR.

_____

[25] McCann relies on evidence suggesting that the MND Projects would result in greenhouse gas emissions during construction that would have been considered significant under an older threshold of significance used by the City. However, state law acknowledges that in many cases, a project's greenhouse gas emissions are "inevitable" and the simple fact that a project will result in greenhouse gas emissions does not mean that it will have a significant impact requiring an EIR. (See, e.g., *Center for Biological Diversity*, *supra*, 62 Cal.4th at pp. 219-221.) The City's published thresholds for significance reveal that the City now relies upon the project's consistency with the Climate Action Plan as the appropriate threshold of significance, not the total emissions caused by the project. McCann does not establish that the MND Projects are inconsistent with the Climate Action Plan, likely because the City did not conduct the required analysis.

51

**D. The Trial Court Did Not Abuse its Discretion in Denying McCann's Request for Preliminary Injunction**

Finally, McCann challenges the trial court's order denying her request for a preliminary injunction. Given our affirmance of the trial court's order denying her writ petition in regard to the Exempt Projects, McCann is unable to demonstrate a probability of prevailing on her claim and, therefore, does not establish a right to a preliminary injunction.

McCann's request for a preliminary injunction arose from her assertion that the City was planning to cut down trees on her street in Kensington. McCann did not seek an injunction for every project, but rather only an injunction barring the City from "cutting down or otherwise destroying and removing any pepper trees in Kensington" during the pendency of this action. McCann does not dispute that her street, and the project in general involving Kensington, was located in "Block 3AA," which was part of the Exempt Projects.

"The general purpose of a preliminary injunction is to preserve the status quo pending a determination on the merits of the action." (*SB Liberty, LLC v. Isla Verde Assn., Inc.* (2013) 217 Cal.App.4th 272, 280.) "In determining whether to issue a preliminary injunction, the trial court considers: (1) the likelihood that the moving party will prevail on the merits and (2) the interim harm to the respective parties if an injunction is granted or denied. The moving party must prevail on both factors to obtain an injunction. Thus, where the trial court denies an injunction, its ruling should be affirmed if it correctly found the moving party failed to satisfy either of the factors." (*Sahlolbei v. Providence Healthcare, Inc.* (2003) 112 Cal.App.4th 1137, 1145.)

Here, the trial court found that McCann could not establish a probability of prevailing on the merits because the trial court denied her writ

petition at the same hearing.  In regard to the Exempt Projects, we affirm the trial court's denial of McCann's writ petition.  Thus, McCann fails to establish on appeal that she has a probability of prevailing on the merits of her claim such that she fails to establish an abuse of discretion by the trial court in denying her request for a preliminary injunction.  (See, e.g., *MaJor v. Miraverde Homeowners Assn.* (1992) 7 Cal.App.4th 618, 623.)

## DISPOSITION

The judgment is reversed with directions to the trial court to enter a new judgment granting the petition as to the second cause of action challenging the MND Projects and to issue a peremptory writ of mandate directing the City to set aside its March 5 and March 7, 2019, resolutions adopting the mitigated negative declaration, the mitigation monitoring and reporting program, and establishing the relevant utility undergrounding districts.  In all other respects, the judgment is affirmed.  The order denying the request for preliminary injunction is affirmed.  The parties are to bear their own costs on appeal.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.

53